E-FILED
Thursday, 20 October, 2022  03:34:19 PM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | |
|---|---|
| **YULIY BARYSHNIKOV, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | **Case No. 22-CV-2140** |
| ) | |
| **ALEJANDRO MAYORKAS, in his official** ) | |
| **capacity as Secretary of Homeland Security,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>ORDER</u>

Plaintiffs filed their Complaint (#1) and Motion for a Temporary Restraining Order (#2) on June 27, 2022.  Plaintiffs request this court enjoin certain sections of Presidential Proclamation 10043, which bars the issuance of F and J visas to a Chinese national "who either receives funding from or who currently is employed by, studies at, or conducts research at or on behalf of, or has been employed by, studied at, or conducted research at or on behalf of, an entity in the PRC [People's Republic of China] that implements or supports the PRC's 'military-civil fusion strategy.'"  Defendants filed their Response (#10) on August 24, 2022, to which Plaintiffs filed a Reply (#11) on September 19, 2022.  For the following reasons, Plaintiffs' Motion for a Temporary Restraining Order (#2) is DENIED.

BACKGROUND

Plaintiffs have moved for a temporary restraining order ("TRO"), as opposed to a preliminary injunction.  However, the standards for granting a TRO and a preliminary injunction are the same; thus, the court will use the terms interchangeably throughout this Order.  See *Cassell v. Snyders*, 458 F.Supp.3d 981, 990 (N.D. Ill. 2020).  In considering a preliminary injunction, the court may rely on the allegations in the pleadings, evidence adduced at an evidentiary hearing, or evidence presented in the preliminary injunction briefing.  *Packaging Corp. of America, Inc. v. Croner*, 419 F.Supp.3d 1059, 1062 n.1 (N.D. Ill. 2020).  The court has reviewed the pleadings, briefs, and documentary evidence provided by the parties.  The court finds the following facts for purposes of this Order only, based on the record before it at this early point in the case, and under the unique circumstances of a motion for a TRO.  These findings are without prejudice to any future findings.  The factual findings are based on the allegations in Plaintiffs' Complaint and declarations and documents attached to Plaintiffs' TRO Motion.

*Background*

<u>Introductory Summary</u>

Plaintiffs[1] have brought this action to challenge Defendants'[2] "continuing efforts to ban the entry of Chinese nationals who seek to study at United States universities." On May 29, 2020, then-United States President Donald J. Trump promulgated Presidential Proclamation 10043 ("the Proclamation"), entitled "Proclamation on the Suspension of Entry as Nonimmigrants of Certain Students and Researchers From the People's Republic of China." The Proclamation, in general, suspends the entry of Chinese nationals who are graduate students or researchers and are currently or previously connected with entities in the PRC that "implement or support [the PRC government's] 'military-civil fusion strategy.'"

<u>President Trump's Statements Concerning the PRC</u>

Former President Trump repeatedly campaigned on the promise that, if he were elected in 2016, he would adopt an aggressive foreign policy against the PRC, promising that he would declare the PRC a currency manipulator, adopt a zero-

---

[1]Plaintiff Yuliy Baryshnikov, a lawful permanent resident of the United States, is a professor of Mathematics and Electrical and Computer Engineering at the University of Illinois Urbana-Champaign, who currently serves as the director of graduate student admissions for the University's Department of Mathematics. The remaining Plaintiffs are all Chinese nationals who reside in the PRC and whose visa applications to study in the United States have been denied, sometimes multiple times, under the authority of the Presidential Proclamation at issue in this case.

[2]Defendants are representatives and departments of the federal government: President Joseph R. Biden; the Department of Homeland Security; Alejandro Mayorkas, in his official capacity as U.S. Secretary of Homeland Security; the Department of State; and Antony J. Blinken, in his official capacity as U.S. Secretary of State.

tolerance policy on intellectual property theft and forced technology transfer, and fight the PRC's allegedly lax labor and environmental standards.  He punctuated his presidential campaign with inflammatory comments regarding the PRC, going so far as to accuse the PRC of "raping" the United States.  Prior to launching his campaign, Trump had made derogatory comments towards the PRC, accusing the country of cheating, stealing the United States' national security and corporate secrets, and wanting to "own" the United States.

U.S. Government Actions Taken Against Chinese Students Prior to the Implementation of the Proclamation

In June 2018, the U.S. State Department began restricting visas for Chinese graduate students in "sensitive research fields" by shortening the duration of visas issued to a single year.  These research fields included fields such as robotics, aviation, and high-tech manufacturing.  At some point in 2018, Senior Advisor for Policy Stephen Miller proposed banning the issuance of visas to all Chinese nationals.  This policy was directly considered by President Trump.  The restriction on issuing visas was coupled with aggressive investigations by the FBI into Chinese academics, resulting in the cancellation or review of visas for approximately 30 Chinese professors between 2018 and 2019.  The changes to visa policy caused extensive delays in the processing of Chinese student visas, resulting in significant hardship for hundreds of students and disruption of their studies.  As a direct result, Chinese students at the University of Illinois Urbana-Champaign organized a petition demanding that the U.S. government explain the delays associated with student visa processing.

4

President Trump's Statements Regarding the PRC Prior to Issuance of
<u>Proclamation and Thereafter</u>

The first human cases of COVID-19 were identified in Wuhan, PRC, in December
2019.  The association between the origin of COVID-19 and the PRC led to use of
derogatory phrases such as the "Chinese flu," "China flu," and "Wuhan flu."  President
Trump embraced the term "China flu" in March 2020 despite rising xenophobia against
Asian-Americans and people of Chinese ancestry.  He persisted in using the term
"China flu" or variants such as "China virus" through the end of his term.

<u>Presidential Proclamation 10043</u>

President Trump issued the Proclamation on May 29, 2020, and it was entered in
the Federal Register at 85 F.R. 34353 on June 4, 2020.  The Proclamation cites "sections
212(f) and 215(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1182(f)
and 1185(a), and section 301, of title 3, United States Code" as the authority under
which it was issued.

The Proclamation bars the entry of any non-immigrant PRC national who seeks
an F or J visa for graduate study or research and is connected with an entity that
supports the PRC's "military-civil fusion strategy."  Specifically, sections 1, 2, and 6 of
the Proclamation bar the issuance of F and J visas to a Chinese national "who either
receives funding from or who is currently employed by, studies at, or conducts research
on behalf of, or has been employed by, studied at, or conducted research on behalf of,
an entity in the PRC that implements or supports the PRC's 'military-civil fusion
strategy.'"  The "military-civil fusion strategy" is defined within the Proclamation as

5

"actions by or at the behest of the PRC to acquire and divert foreign technologies, specifically critical and emerging technologies, to incorporate into and advance the PRC's military capabilities."

The President used the Proclamation to restrict the entry of certain Chinese national graduate students based on their funding from, employment or studies with, or research at or for, entities that seek to steal "sensitive United States technologies and intellectual property" in order to bolster the PRC military (the People's Liberation Army ("PLA")).  The President, in the Proclamation, found that the PRC is engaged in a wide-ranging and heavily resourced campaign to acquire sensitive United States technologies and intellectual property, in part to bolster the modernization and capability of the PRC military.  The President further found that this effort is a threat to the United States' long-term economic vitality and the safety and security of the American people.  To further its ends, the PRC used some Chinese students, mostly post-graduate students and post-doctorate researchers, to operate as non-traditional collectors of intellectual property.  Graduate students from the PRC who are associated with the PLA are at high-risk to be co-opted by PRC authorities, and "provide particular cause for concern." Accordingly, the President found that "the entry of certain nationals of the PRC seeking to enter the United States ... to study or conduct research in the United States would be detrimental to the interests of the United States."

6

A press release issued by then U.S. Secretary of State Mike Pompeo on June 1, 2020, claimed that the Proclamation "limits the People's Liberation Army's ability to misuse non-immigrant student and researcher programs."  Secretary Pompeo further claimed that "the graduate students and researchers who are targeted, co-opted, and exploited by the PRC government for its military gain represent a small subset of Chinese student and researcher visa applicants coming to the United States."

The United States government has published little to no information on the criteria used to evaluate Chinese applicants for the F and J graduate visas.  The relevant Foreign Affairs Manual section has redacted both the academic fields covered by the Proclamation as well as the list of entities allegedly affiliated with the PRC's "military-civil fusion strategy."

The Proclamation went into effect on June 1, 2020, and has never been rescinded.

<u>Impact of the Proclamation</u>

The Center for Security and Emerging Technology at Georgetown University has estimated that between 3,000 and 5,000 Chinese nationals have been and will be affected by the Proclamation every year.  A separate estimate based on general data provided by U.S. consulates indicates that between 700 and 1,300 visas were denied between the implementation of the Proclamation in June 2020 and August 2021.  However, this estimate does not include those potential students who did not apply for a visa due to fear of denial.

7

Plaintiff Baryshnikov, in his declaration (#2-4), states that he is a permanent resident of the United States and a professor at the University of Illinois Urbana-Champaign, in both the Department of Mathematics and Department of Electrical and Computer Engineering.  He serves as the Director of Graduate Studies for the Department of Mathematics.  The Proclamation has affected him in several ways: (1) it has affected the applicant pool of students seeking admission at the University, which obstructs the discharge of his duties as Director of Graduate Studies; (2) it has prevented students who were previously admitted to the University from attending; and (3) it has prevented him from effectively interacting with students regarding their shared research interests.

Plaintiff Dongzi Li is a Chinese national who resides in the PRC.  He states in his declaration (#2-3) that he has traveled to the United States in the past, prior to the Proclamation's implementation.  He has recently been admitted to the University of Illinois Urbana-Champaign as a Ph.D. student studying industrial engineering, but his visa applications have been denied under the authority of the Proclamation.  Therefore, he has been unable to effectively advance his studies for his Ph.D., and is unlikely to be able to obtain his degree absent a suspension or revocation of the Proclamation.  He has further been unable to effectively collaborate with, and interact with, Plaintiff Baryshnikov regarding a shared research interest which concerns stochastic optimization.

<u>Allegations in Complaint</u>

Plaintiffs' Complaint contains four[3] causes of action.

Count I, concerning all Plaintiffs, alleges that sections 1, 2, and 6 of the Proclamation exceed the scope of the President's authority under §§ 1182(f) and 1185(a) of the INA, excluding aliens whose entry would not be "detrimental to the interests of the United States" within the meaning of those terms as informed by their text, history, and context, and by failing to adequately find that the entry of such aliens would be harmful to the United States.

Count II, concerning Plaintiff Baryshnikov, alleges violations of the First and Fourteenth Amendments to the U.S. Constitution, in that Defendants' "violations inflict ongoing harm upon Plaintiff Baryshnikov by denying him the ability to associate with Chinese nationals and engage in educational activities with Chinese nationals."

Count III, concerning all Plaintiffs, alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(C), in that, in implementing sections 1, 2, and 6 of the Proclamation, Defendants exceeded their constitutional and statutory authority under the First and Fourteenth Amendments and the INA, engaged in nationality-based discrimination, and failed to vindicate statutory rights guaranteed by the INA.  Plaintiffs further allege Defendants, in enacting sections 1, 2, and 6, acted arbitrarily and capriciously.

─────────────────

[3]Plaintiffs have mislabeled the number of counts in their Complaint, skipping from "Count I" to "Count III," thereby making it appear there are five counts.  There are only four counts, and the court will label the counts based on their proper numerical designation.

For example, Defendants have not offered a satisfactory explanation for the PRC nationals that are and are not included within the scope of the Proclamation.

Count IV, concerning all Plaintiffs, also alleges violations of the APA, 5 U.S.C. § 706(2)(D), in that, in enacting sections 1, 2, and 6 of the Proclamation, Defendants have changed the substantive criteria by which individuals from the PRC may enter the United States, impacting the substantive rights of both Chinese and U.S. citizens. Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the orders.

Plaintiffs claim that the Proclamation has caused, and continues to cause, irreparable injury to themselves and, as an immediate remedy, asks this court to enter a nationwide TRO enjoining the implementation of sections 1, 2, and 6 of the Proclamation.

ANALYSIS

In support of their request for a nationwide TRO, Plaintiffs argue that: (1) they will suffer irreparable harm if relief is not granted; (2) Plaintiff Baryshnikov has no adequate remedy at law; (3) they have a likelihood of success on the merits; and (4) the balance of hardships and public interests favor Plaintiffs.

Defendants' Response primarily argues that Plaintiffs have not shown a likelihood of success.  Defendants further argue that, even if they could show a likelihood of success, Plaintiffs have not demonstrated irreparable harm or that the balance of equities favors them.

*Injunctive Relief Standard*

As stated above,  the standards for granting a TRO and a preliminary injunction

are the same.  *Cassell*, 458 F.Supp.3d at 990.  A preliminary injunction is an exercise of a

very far-reaching power, never to be indulged in except in a case clearly demanding it,

and is never awarded "as a matter of right."  *Valencia v. City of Springfield*, 883 F.3d 959,

965 (7th Cir. 2018).  "To determine whether a situation warrants such a remedy, a

district court engages in an analysis that proceeds in two distinct phases: a threshold

phase and a balancing phase."  *Valencia*, 883 F.3d at 965.

To survive the threshold phase, a party seeking a preliminary injunction must

satisfy three requirements, in that it must show that: (1) its claim has some likelihood of

succeeding on the merits absent a preliminary injunction; (2) it will suffer irreparable

harm in the interim period prior to final resolution of its claims; and (3) traditional legal

remedies would be inadequate.  *Valencia*, 883 F.3d at 965.

If the moving party satisfies each of these requirements, the court proceeds to the

balancing phase of the analysis, where it weighs the irreparable harm that the moving

party would endure without the protection of the preliminary injunction against any

irreparable harm the nonmoving party would suffer if the court were to grant the

requested relief.  *Valencia*, 883 F.3d at 966.  In so doing, the court employs a sliding scale

approach: the more likely the plaintiff is to win, the less heavily need the balance of

harms weigh in his favor; the less likely he is to win, the more the balance needs to

weigh in his favor.  *Valencia*, 883 F.3d at 966.  "'Where appropriate, this balancing

process should also encompass any effects that granting or denying the preliminary

11

injunction would have on nonparties (something courts have termed the "public interest")." *Valencia*, 883 F.3d at 966, quoting *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).

   *Likelihood of Success on the Merits*

   The parties first dispute whether any of Plaintiffs' claims serving as a basis for the imposition of a TRO have any chance for success on their own merits.

    This first step in the injunctive relief inquiry requires that Plaintiffs demonstrate that their claim has some likelihood of success on the merits, not merely a better than negligible chance. *Lukaszczyk v. Cook County*, 47 F.4th 587, 598 (7th Cir. 2022). "'If it is plain that the party seeking the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms.'" *Valencia* 883 F.3d at 966, quoting *Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993). Thus, if Plaintiffs fail to establish their likelihood of success on the merits, the court need not address the remaining preliminary injunction elements. See *Lukaszczyk*, 47 F.4th at 598.

   Plaintiffs argue that they have a likelihood of success on: (1) Plaintiff Baryshnikov's First and Fourteenth Amendment claims and (2) Plaintiffs' APA claims because (a) the visa denials challenged are final agency actions and (b) Plaintiffs can prove the necessary degree of success for their APA claims.

Defendants respond that success on the merits is unlikely because: (1) the Proclamation fits well within the bounds of the statutory authority granted by § 1182(f) of the INA; (2) Baryshnikov cannot show a First or Fourteenth Amendment violation; and (3) the APA does not authorize Plaintiffs to challenge presidential action.

<u>Whether the Proclamation is Within Authority Granted Under the INA</u>

Plaintiffs, in their Motion, make no argument that the Proclamation is not within the president's broad authority under § 1182(f) of the INA.  The section, entitled "Suspension of entry or imposition of restrictions by President" states:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f).

The U.S. Supreme Court has recognized that this statutory section "grants the President sweeping authority to decide whether to suspend entry, whose entry to suspend, and for how long."  *Trump v. Hawaii*, 138 S.Ct. 2392, 2413 (2018).  Under this section, "Presidents have repeatedly suspended entry not because the covered nationals themselves engaged in harmful acts but instead to retaliate for conduct by their governments that conflicted with U.S. foreign policy interests."  *Trump*, 138 S.Ct. at 2413.

Here, President Trump, and President Biden, have, by the Proclamation, restricted the entry of certain Chinese nationals graduate students working in certain fields based on their connections to the PLA.  The Proclamation was issued on the basis of protecting national security.  This would fall squarely within the language contemplated by § 1182(f), granting the president "sweeping authority" to suspend or restrict the entry of "all aliens or any class of aliens" if the president finds their entry would be detrimental to the interests of the United States.

Indeed, in *Trump v. Hawaii*, the Supreme Court upheld a much broader Proclamation that barred entry to foreign nationals from multiple countries without regard to their connection to those countries' military or intelligence services.  138 S.Ct. at 2399-400.  Plaintiffs make no argument that President Trump, in issuing the Proclamation, did not have the authority to do so under the statute or that he should have made additional findings to those that served as the stated basis for the Proclamation.  Rather, Plaintiffs focus their Motion for TRO on arguments that the Proclamation itself violates Plaintiff Baryshnikov's First Amendment and Due Process rights, and that they can challenge the Proclamation under the APA.

<u>First Amendment and Fourteenth Amendment Due Process</u>

Plaintiffs argue that the barring of the entry of non-citizens creates a viable due process claim for citizens, like Baryshnikov, who have an interest in those specific non-citizens' ability to travel to the United States.  Plaintiffs further argue that Baryshnikov has "a viable First Amendment claim [that] extends into the academic environment

14

when it concerns academic association and relationships." Plaintiffs note that a U.S. citizen raising a constitutional challenge to a denial of a visa is entitled to a limited judicial inquiry regarding the reason for the decision. Plaintiffs further note that, although rational basis review is a deferential standard, it does not mean the government wins by default, and that, when it concerns a "significant right," "heightened rational basis review," more akin to intermediate or strict scrutiny, may be applied.

Defendants respond that: (1) the U.S. Supreme Court has never definitively held that a U.S. citizen can even bring a constitutional challenge to a presidential action to suspend the issuance of visas to, or the entry of, foreign nationals, but rather has always rejected those challenges on the merits; (2) it is questionable whether the incredibly deferential standard given to constitutional claims of this kind are even susceptible to judicial review; and (3) even applying rational basis review, Plaintiffs have no constitutional claim.

In their Reply, Plaintiffs respond that: (1) the U.S. Supreme Court has acknowledged that U.S. citizens who claim that the exclusion of aliens violates the citizens' constitutional rights may obtain judicial review of the exclusion decisions; (2) Plaintiffs have supplied evidence of bad faith in the form of President Trump's derogatory statements towards the PRC and Chinese nationals sufficient to trigger rational basis review; and (3) rational basis "with bite" review should apply, and under that standard it is likely Plaintiffs will succeed on the merits.

The court does not address Defendants' arguments about judicial review[4] because, advancing Plaintiffs' constitutional claims to rational basis review, the claims cannot survive that deferential standard.  First, the court notes that Plaintiffs provide no basis for applying "heightened rational basis review" to this case.  The most analogous case on point, *Trump v. Hawaii*, clearly indicates that claims of this nature challenging presidential proclamations under § 1182(f), if they can be reviewed at all, are reviewed under the rational basis standard.  See *Ramos v. Wolf*, 975 F.3d 872, 895-96 (9th Cir. 2020), citing *Trump*, 138 S.Ct. at 2418-19.  This is due to the Supreme Court's recognition of the fundamental authority of the executive branch to manage our nation's foreign policy and national security affairs without judicial interference.  *Ramos*, 975 F.3d at 895, citing *Trump*, 138 S.Ct. at 2419.

Plaintiffs have cited no case that would apply any form of "heightened" rational basis review to the Proclamation in this case.  Plaintiffs, in support of applying the heightened standard, argue only that this case involves "a political[ly] powerless individual (a foreign national), who simply cannot wipe an immutable characteristic (prior educational achievement), and his inability to receive a visa significantly burdens a U.S. permanent resident's right to freely associate with the individuals of his choosing."  However, when faced with an executive order on a similar issue, issued pursuant to the authority granted under the same statute, on an arguably much broader

---

[4]By progressing directly to rational basis review, the court makes no judgment as to the validity of the other arguments raised in Defendants' Response at pages 8 through 11.

class of aliens, the Supreme Court applied standard rational basis review, not the

heightened standard urged by Plaintiffs.  See *Trump*, 138 S.Ct. at 2418-19.  Thus, the

Supreme Court's *Trump* decision applying rational basis review would appear to be

directly on-point with the factual posture of this case.  Standard rational basis review

applies.

  Assuming that the court may look behind the face of the Proclamation in

applying rational basis review, that standard of review considers whether the visa

policy is plausibly related to the government's stated objective to prevent the risk of

theft of U.S. intellectual property and technology by Chinese national graduate students

with ties to entities thought to be linked to the PLA.  See *Trump*, 138 S.Ct. at 2420.  As a

result, the court may consider Plaintiffs' extrinsic evidence, but will uphold the policy

so long as it can reasonably be understood to result from a justification independent of

unconstitutional grounds.  See *Trump*, 138 S.Ct. at 2420.  The Proclamation satisfies

rational basis so long as it is rationally related to some legitimate government interest,

and will bear a strong presumption of validity.  *Foxxxy Ladyz Adult World, Inc. v. Village

of Dix, Ill.*, 779 F.3d 706, 719-20 (7th Cir. 2015).  As a result, Plaintiffs bear the burden of

negating "every conceivable basis which might support it."  See *Foxxxy Ladyz*, 779 F.3d

at 720.

Further, under rational basis review, it is entirely irrelevant whether the conceived reason for the challenged policy actually motivated the decisionmaker, because that choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.  See *Foxxxy Ladyz*, 779 F.3d at 720, citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993).

Here, the Proclamation is certainly premised on a legitimate purpose: protecting U.S. national security and intellectual property and technology interests.  The purpose is legitimate, falling squarely under the president's authority in § 1182(f) to act if he or she finds that the entry of certain aliens would be detrimental to the interests of the United States.  President Trump, in the Proclamation, specifically found that "students or researchers from the PRC studying or researching beyond the undergraduate level who are or have been associated with the PLA are at high risk of being exploited or co-opted by the PRC authorities and provide particular cause for concern."  The limited scope of the visa policy, targeting only those Chinese national graduate studies associated with entities connected to the PLA and the "military-civil fusion strategy" bear a reasonable relation to the undoubtedly legitimate reasons behind the Proclamation.  See *Foxxxy Ladyz*, 779 F.3d at 720.

The deference the court affords executive policy in this area is strengthened by the fact that it concerns national security and entry to the United States under an express grant of authority in § 1182(f).  See *Trump*, 138 S.Ct. at 2421-22 (courts cannot substitute their own assessment for the executive's predictive judgments on national

18

security matters, all of which are delicate, complex, and involve large elements of prophecy, because, while courts do not defer to the government's reading of the First Amendment, the executive's evaluation of the underlying facts is entitled to appropriate weight, particularly in the context of litigation involving sensitive and weighty interests of national security and foreign affairs).  As the Ninth Circuit wrote when comparing the executive order at issue in *Trump* versus an agency's decision to terminate a Congressionally-created relief program, "the level of deference that courts owe to the President in his executive decision to exclude foreign nationals who have not yet entered the United States may be greater than the deference to an agency in its administration of a humanitarian relief program established by Congress for foreign nationals who have lawfully resided in the United States for some time."  *Ramos*, 975 F.3d at 896.

The court would also note that Plaintiffs, outside of a couple of brief, generalized sentences about how a significant right is being impacted and why heightened scrutiny should apply, make no specific, detailed argument as to why the Proclamation would not survive rational basis review.

Perhaps Plaintiffs means to argue by implication that Trump's pre-Proclamation statements against the PRC evince an improper discriminatory purpose as the true motivation behind the Proclamation, but this allegation is insufficient to render the Proclamation invalid under rational basis review so long as some hypothetical legitimate government interest exists to support the challenged policy.  See *Foxxxy*

19

*Ladyz*, 779 F.3d at 720.  For the reasons detailed above, that legitimate government interest clearly exists, and the Proclamation readily satisfies rational basis review. Plaintiffs are unlikely to succeed on the merits of the First and Fourteenth Amendment claims.

APA Claim

This leaves Plaintiffs' claims under the APA in Counts III and IV.  Plaintiffs argue that they fall within the "zone of interests" protected by the APA, and thus have the ability to sue.  They argue that the visa denials are final agency actions under the APA, and that they can prove the necessary degree of success for their APA claims.

Defendants respond that Plaintiffs claims fail as a matter of law because foreign nationals cannot challenge the denial of a visa under the principle of consular nonreviewability, which the APA did not supersede, and because presidential actions are not reviewable under the APA and are not subject to APA requirements.  Plaintiffs concede the consular nonreviewability principle bars the claims of Plaintiff Li, but argue it does not bar Baryshnikov's claim.  Plaintiffs argue that Baryshnikov still has a claim under the APA, and that although presidential actions may not be reviewable under the APA, the court can review the actions of the federal agencies charged with the Proclamation's implementation, which is Plaintiffs' intent here.

Defendants first argue that foreign nationals, such as all Plaintiffs other than Baryshnikov, cannot challenge the denial of a visa under the principle of consular nonreviewability, which the APA did not supersede.  "Consular nonreviewability" is

the general rule that decisions to issue or withhold a visa are not reviewable in court unless Congress says otherwise, and, "[i]n its purest form," creates a general norm of nonreviewability for decisions made by consular officials abroad. *Matushkina v. Nielsen*, 877 F.3d 289, 294 (7th Cir. 2017); *Joorabi v. Pompeo*, 464 F.Supp.3d 93, 101 (D.D.C. 2020) (The doctrine of consular nonreviewability applies to bar claims brought by foreign nationals challenging their visa denial under the APA, as the APA does not provide a valid cause of action if another statute precludes judicial review through its express language, structure of the statutory scheme, its objectives, its legislative history, or the nature of the administrative action involved. "Congress has made it clear that aliens cannot seek review of their exclusion orders under the APA."). Plaintiffs, at page 7 of their Reply (#11), concede this argument with respect to the Chinese national Plaintiffs. Thus, there is no likelihood of success on the merits for those Plaintiffs on their APA claims.

Plaintiffs contest the application of this doctrine with respect to Plaintiff Baryshnikov, as he is a lawful permanent resident. The Supreme Court has recognized a "narrow exception" to the general rule of consular nonreviewability, allowing for limited judicial review when a U.S. citizen's own constitutional rights[5] are assertedly

---

[5]This narrow exception applies to Baryshnikov, even though he is not a U.S. citizen, because he is a lawful permanent resident. "If a consulate's decision implicates the constitutional rights of United States citizens *or lawful permanent residents*, a court may review a challenge to the application. In such circumstances, a court may review the decision solely to determine whether the consulate provided a facially legitimate reason for its visa decision." *Baaghil v. Miller*, 1 F.4th 427, 432 (6th Cir. 2021) (emphasis added).

burdened by a visa denial.  *Sesay v. United States*, 984 F.3d 312, 315 (4th Cir. 2021), citing

*Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972).  However, even to the extent that

Baryshnikov could raise this claim, the court has already found that he has little to no

likelihood of success on his constitutional claims (see above), and thus the narrow

exception to the general rule of consular nonreviewability would not apply to

Baryshnikov.  See *Adeyemo v. Kerry*, 2013 WL 498169, at *2-3 (D. Md. Feb. 7, 2013); *Straw*

*v. U.S. Department of State*, 2020 WL 2490022, at *16 (D. Md. May 14, 2020); see also

*Macena v. U.S. Citizenship and Immigration Services*, 2015 WL 6738923 (D. Md. Nov. 2,

2015) ("thus, Macena has not asserted a plausible constitutional claim that would allow

for even a limited review of the consular officer's decision[,]" and, "[a]ccordingly, to the

extent that Macena seeks review of the consular officer's determination or an order

requiring the consular officer to grant a visa to Poulard, the doctrine of consular

nonreviewability bars consideration of that claim.").  Because none of Plaintiffs' claims

can survive the doctrine of consular nonreviewability, Plaintiffs have no likelihood of

success on the merits of their APA claims.

Because Plaintiffs have failed to establish their likelihood of success on the

merits, the court need not address the remaining preliminary injunction elements.  See

*Lukaszczyk*, 47 F.4th at 598. For the above reasons, Plaintiffs' Motion for a Temporary

Restraining Order (#2) is denied.

IT IS THEREFORE ORDERED:

(1)     Plaintiffs' Motion for a Temporary Restraining Order (#2) is DENIED.

(2)     This case is referred to the magistrate judge for further proceedings in

         accordance with this Order.

         ENTERED this ___20th___ day of _____October_____, 2022.


                         s/ COLIN S. BRUCE
                         U.S. DISTRICT JUDGE